# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

<table>
<tr><td>

DANIEL BALDWIN,

               Plaintiff,

    v.

CHRISTOPHER GRAMICCIONI, *et al.*,

             Defendants.

</td><td>

:
:
:
:
:
: Civil Action No. 16-1675 (FLW) (DEA)
:
: **OPINION**
:
:
:
:
:
:

</td></tr>
</table>

**WOLFSON, United States Chief District Judge**

Plaintiff Daniel Baldwin ("Plaintiff"), an African American male, alleges that his employer, defendant Monmouth County Prosecutor's Office (the "MCPO"), and his supervisor, Christopher Gramiccioni ("Prosecutor Gramiccioni"), the Monmouth County Prosecutor (collectively, "Defendants") have intentionally refused to promote Plaintiff to the position of Sergeant on four separate occasions on the basis of race, in violation of Title VII of the Civil Rights Act of 1963, 42 U.S.C. § 2000e, et seq. ("Title VII"), the New Jersey Law Against Discrimination, N.J.S.A. § 10:5-3, et seq. ("NJLAD"), and 42 U.S.C. § 1983 under the 14th Amendment's Equal Protection Clause. In the instant matter, the MCPO and Prosecutor Gramiccioni separately move for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, Defendants' motions are **GRANTED** in their entirety.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The following facts are undisputed unless otherwise noted. Plaintiff is an African American male, who had worked for the Somerset County Prosecutor's Office, the Essex County Prosecutor's Office, and the Hillside Police Department, before he ultimately joined the MCPO in

October 2006. MCPO Facts, ¶¶ 1-3. From 2006 until April 2013, Plaintiff was assigned to the MCPO's Major Crimes Unit, and, during this time, Plaintiff's Performance Evaluations showed that he was a "competent detective who met or exceeded expectations" in most categories. *Id*. at ¶¶ 5-6. In 2009, Plaintiff served as the lead detective in the murder investigation of Jonelle Melton (the "Melton Case"), one of the MCPO's highest profile investigations, involving a schoolteacher who was killed during an attempted robbery. *Id*. at ¶ 7.

In 2011, Gramiccioni joined the MCPO as the First Assistant Prosecutor, prior to becoming the Acting Prosecutor in July 2012. *Id*. at ¶ 8. In June 2012, Plaintiff was still the lead investigator on the Melton Case, which remained unsolved; however, he requested to be transferred from the Major Crimes Unit to the Financial Crimes Unit. *Id*. at ¶ 9. In April 2013, the MCPO granted Plaintiff's request, but he continued to be involved in the Melton Case; in addition, for an unspecified period of time after his transfer, Plaintiff was detailed to the Organized Crime Unit in order to assist on a wiretap investigation, the target of which included a suspect in the Melton Case. *Id*. at ¶¶ 10-11.

In July 2013, the MCPO hired Kevin Mahoney as a detective ("Mahoney"). *Id*. at ¶ 12. Mahoney did not possess any prior law enforcement experience, but he was a United States Army Veteran who served in Operation Iraqi Freedom, during which he received multiple accolades, including an "Army Commendation Medal" and "Combat Infantry Badge." *Id*. He also held two Masters Degrees, one of which was in Business Administration, and he had more than 20 years of experience in the private sector, at companies such as Boeing, where he oversaw and managed "personnel and significantly large budgets." *Id*. In addition, Mahoney had previously attended the Criminal Justice Academy, where he earned the "Merit Award" because of his leadership abilities. *Id*. at ¶ 13.

Based on his financial background and experience, Prosecutor Gramiccioni and Chief Pasterchick, a former Special Agent for the IRS and DEA who was appointed as the Chief for the MCPO in 2006, assigned Mahoney to the Financial Crimes Unit. *Id*. at ¶¶ 13, 42. Subsequently, as a result of his "unremarkable performance," Plaintiff was transferred from the Financial Crimes Unit to the Trial Support Section, where his responsibilities included handling investigations and mentoring new or junior detectives. *Id*. at ¶¶ 14-15. Although Plaintiff characterized his reassignment as "punishment detail," intended to "minimize his work productivity and severely reduce his ability to be promoted[,]" Prosecutor Gramiccioni viewed the Trial Support Unit as an important "training ground" for newly hired detectives. *Id*. at ¶¶ 16-17. In fact, Prosecutor Gramiccioni previously promoted a Sergeant from the Trial Support Unit to the Major Crimes Bureau as a Lieutenant, on the basis of his exemplary performance in the Trial Support Unit. *Id.* at ¶ 17.

In 2014, Detective Samis was designated as the lead detective in the Melton Case, following which, in November 2015, suspects were arrested in connection with the ongoing murder investigation of Ms. Melton. *Id.* at ¶¶ 18-19.

In March 2015, while in an elevator, Plaintiff and Prosecutor Gramiccioni discussed Plaintiff's assignment to the Trial Support Unit, and Plaintiff opined that his talents were being underutilized. *Id.* at ¶¶ 20-21. Following their conversation, Plaintiff received an email from Prosecutor Gramiccioni, inviting Plaintiff to meet with him and the Chief of Detectives to discuss Plaintiff's "career path." *Id.* at ¶ 23. However, on the advice of counsel, Plaintiff declined Prosecutor Gramiccioni's invitation; instead, on May 29, 2015, Plaintiff filed an internal complaint with Kevin Burke, the Monmouth County Deputy Administrator. *Id.* at ¶¶ 24-26. In the complaint,

Plaintiff alleged that he had been denied several promotions within the MCPO, on the basis of his race. *Id.* at ¶ 25.

As the former Director of Human Resources, Mr. Burke was familiar with the County's Employee Guide Prohibiting Workplace Discrimination and Harassment (the "Discrimination Policy"). *Id.* at ¶ 28. The Discrimination Policy was distributed throughout the MCPO, and it precluded employees from engaging in discrimination and/or harassment based on the enumerated NJLAD protected classes; in addition, it established a procedure for employees to file complaints of discrimination with the County. *Id.* at ¶¶ 29-30. According to the Discrimination Policy, the County would investigate complaints of discrimination and render remedial action, if appropriate. *Id.* at ¶ 31.

Plaintiff preferred Mr. Burke to investigate his discrimination complaint because of his unique background. *Id.* at ¶¶ 33, 35. In addition to his lengthy experience in Human Resources, Mr. Burke was formerly employed by the New Jersey State Police for 25 years, until he retired as a Major/Troop Commander. *Id.* at ¶ 34. After Mr. Burke agreed to conduct the investigation, he interviewed Plaintiff for 30 to 45 minutes. *Id.* at ¶ 37. During the interview, Mr. Burke explained that the Prosecutor held a Constitutional Office and neither he, nor Human Resources, possessed the authority to overturn the Prosecutor's promotional decisions. *Id.* at ¶ 37. Plaintiff indicated that he understood, and Mr. Burke subsequently contacted the following parties, in order to advise them of Plaintiff's complaint: (a) Andrea Bazer, County Counsel; (b) Teri O'Connor, County Administrator; and (c) Frank Tragno, Jr., the former Monmouth County Human Resources Director. *Id.* at ¶ 38.

Prosecutor Gramiccioni expressed his approval of Mr. Burke's investigation, and the County designated Steve Kleinman, the Special Monmouth County Counsel who handled labor

and employment matters, to provide technical and legal advice to Mr. Burke during the course of the investigation. *Id.* at ¶ 39. Prosecutor Gramiccioni also provided the following materials to assist with Mr. Burke's investigation: (a) information relating to the demographic makeup of the office and promotions of African Americans within the MCPO; and (b) a copy of the MCPO's promotional policies and procedures. *Id.* at ¶ 40.

The MCPO's promotional policies and procedures, which were in place before Prosecutor Gramiccioni was appointed, explicitly state that: "[w]hile there are no standardized lists of criteria that will be used in this process, promotions may be based upon a wide range of factors," including "past performance, evaluations, law enforcement experience, unique abilities or expertise needed for the position, training, displayed leadership qualities, and the overall assessment of the candidate's skills and abilities." Prosecutor Gramiccioni's Statement of Material Facts ("Prosecutor's Facts"), ¶¶ at 14, 18. Ultimately, however, a promotional decision is based on "the Prosecutor's discretion." Shortly after his appointment, Prosecutor Gramiccioni emailed his Executive Staff, in which he set forth a specific list of promotional criteria and emphasized that, "although seniority was an important factor," the MCPO would benefit from "candidates that won't just rest on their laurels with the promotion and treat it as an expectation, but who will work to better themselves and the operation as a whole." *Id*. at ¶ 19.[1]

Chief Pasterchick oversaw the MCPO's promotional process, along with his Staff, which included one Deputy Chief of Detectives and three Captains. *Id.* at ¶ 43. In addition, Chief Pasterchick supervised and directed more than eighty law enforcement officers and the criminal investigations which they performed. *Id.* at ¶¶ 41, 43. In that connection, Chief Pasterchick recommended law enforcement officers for promotion to Prosecutor Gramiccioni and his

---

[1]  In that same email, Prosecutor Gramiccioni identified five candidates to consider for a promotion, three of whom were African American. *Id*. at ¶ 20.

Executive Staff, which is comprised of the First Assistant Prosecutor, two Deputy First Assistant Prosecutors, and the Chief of Staff. *Id.* at ¶ 43.

When a supervisory position became available within the MCPO, interested detectives submitted promotional memoranda; after the expiration of a ten-day period, the Chief of Detectives would first review the applications with his deputy chief and captains, in order to provide recommendations. MCPO Facts, at ¶¶ 44-45. The promotional memoranda and recommendations of the Chief of Detectives were then provided to, and reviewed by, the Prosecutor over deliberations with his own Executive Staff. *Id.* at ¶¶ 46-47. Moreover, during those meetings, Chief Pasterchick would reiterate his recommendations, which he based on the following considerations: discussions with his deputy chief and captains; the particular needs of the vacant supervisory position; and the candidates' performance, evaluations, and seniority, as well as their ability to lead and motivate. *Id.* at ¶¶ 49, 51.

Chief Pasterchick also purportedly considered the MCPO's preference for a diverse command structure; during his tenure as the Chief of Detectives, two African American females and one African American male were promoted to supervisory positions, on the basis of Chief Pasterchick's recommendations to the Prosecutor and the Executive Staff. *Id.* at ¶¶ 49, 50. More specifically, Karen Odom was promoted from the position of Lieutenant to Chief Pasterchick's Deputy Chief of Detectives, skipping over the position of Captain, and Natalie Zuppa, as well as Doug Johnson, were both promoted from the position of Sergeant to Lieutenant, and then from Lieutenant to Captain. *Id.* In fact, during his tenure, over sixty percent of Chief Pasterchick's Executive Staff consisted of minorities. *Id.*

Over the course of his investigation, Mr. Burke reviewed the MCPO's promotional policies and procedures, and he interviewed Plaintiff, MCPO senior staff members, and Prosecutor

Gramiccioni. *Id*. at ¶ 52. Ultimately, Mr. Burke concluded that Prosecutor Gramiccioni and his Executive Staff made promotional decisions which were solely based on legitimate, non-discriminatory reasons. *Id*. In other words, Mr. Burke found no evidence to support that Prosecutor Gramiccioni and his Executive Staff either engaged in a general discriminatory practice towards African Americans, or that Plaintiff was transferred to the Trial Support Unit for an improper reason. *Id*. at ¶¶ 53-54. Rather, Mr. Burke determined that the MCPO acted with the intention of "promoting the best-qualified candidate[s] in keeping with the needs of the" department. *Id*. at ¶ 55.

On July 24, 2015, Mr. Burke summarized his findings in a letter to Plaintiff. *Id*. at ¶ 57. In his final remarks, Mr. Burke stated: "[b]ased upon my careful assessment of the situation, as set forth above, there is no basis at this time for me to conclude that you have been subject to racial discrimination in violation of the NJLAD or County policy. However, if you have any further information you wish to bring to my attention now or in the future, I am prepared to review it." *Id*. at ¶ 58. Plaintiff did not provide Mr. Burke with any additional information; rather, on November 25, 2015, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission. *Id*. at ¶¶ 59-60. On January 29, 2016, Plaintiff received a "Right to Sue Letter." *Id*. at ¶ 60.

During the period in dispute,[2] Plaintiff applied to be promoted to the position of Sergeant on May 13, 2014, December 1, 2014, July 28, 2015, and December 9, 2015. On each of those occasions, promotional memoranda from approximately thirty other applicants were submitted for

---

[2] In a previously issued Opinion, further discussed below, the Court found that Plaintiff's § 1983 claims and NJLAD claims that occurred prior to March 24, 2014, as well as Plaintiff's claims under Title VII that occurred prior to January 30, 2015, were barred by the applicable statutes of limitations.

consideration, of which a total of eight candidates were selected to be promoted to the Sergeant position. *Id*. at ¶ 64.

The May 2014 promotions were awarded to George Snowden, to the position of Sergeant in the Narcotics Unit, and Michael Clancy, to the position of Sergeant in the Major Crimes Unit. *Id*.

The MCPO hired Snowden in January 2007, three months after Plaintiff, and he initially was assigned to the Narcotics and Criminal Enterprise Investigation Unit. *Id*. at ¶ 67. Snowden had previously served in a supervisory capacity as a Sergeant at the Newark Police Department. In that regard, he had experience in conducting narcotics and wire intercept investigations, and he provided testimony in various State and Federal Court proceedings, resulting in numerous convictions and the imposition of three life sentences. *Id*. ¶ 68. Snowden's MCPO supervisors were impressed with his abilities, and his chain of command highly recommended him for a promotion. *Id*. Indeed, he developed a reputation as a "go-to person," particularly in narcotics investigations which required "wiretapping expertise." *Id*.

The MCPO hired Clancy in 2009. *Id*. at ¶ 70. Although Clancy was less senior than Plaintiff, he had previously served as a detective in the Ocean County Police Department, where he supervised dayshift operations. *Id*. He received training from the FBI as a Hostage/Crisis Negotiator, a role which he assumed for the Monmouth County Emergency Response Team, until he eventually became the Chief Negotiator; in that capacity, he supervised a six-member team that handled suspect negotiations on all suicidal, barricaded, and hostage situations throughout the entire County of Monmouth. *Id*. Detective Snowden also received training in "homicide investigations, hostage/crises negotiations and arson investigations" from the New Jersey State Police, the New Jersey Division of Criminal Justice, the New York City Police, as well as the FBI.

*Id.* At the MCPO, Clancy handled several "complex" homicide/robbery and arson cases, as he developed a reputation for utilizing "innovative and different" techniques for solving major crimes, and his peers and supervisors spoke "very highly" of his leadership abilities and work ethic. *Id.*

The December 2014 promotions were awarded to Ryan Muller, to the position of Sergeant in the Forensics Unit, and Walter Mazariegos, to the position of Sergeant in the Narcotics Unit. *Id.* ¶¶ 72-73, 77.

Muller joined the MCPO in July 2006, and, as such, he was several months more senior than Plaintiff. Muller was assigned to the Forensics Unit—a "specialized unit," in which Plaintiff never worked. *Id.* ¶¶ 73-74. Indeed, a significant amount of training was required in order to become a "skilled forensics detective." *Id.* at 74. Before the MCPO employed Muller, he acquired experience in forensic investigations, he obtained two Bachelor Degrees from Rutgers University, and was qualified as a Fingerprint Expert, Firearms Expert, and Crime Scene Investigation Expert. *Id.* at ¶ 75. Muller ultimately became the "go to person" within the Forensic and Technical Bureau at the MCPO, the section within which he was promoted. *Id.*

Mazariegos is a bilingual Hispanic American who is Plaintiff's senior by approximately four months at the MCPO. *Id.* at ¶¶ 77, 79. Before joining the MCPO, Detective Mazariegos was employed by the New Jersey Attorney General's Division of Criminal Justice, and, in cooperation with the DEA, the Attorney General's Diversion Unit, and the New Jersey Department of Consumer Affairs, he conducted sensitive prescription narcotics investigations involving medical professionals who illegally or improperly prescribed and distributed narcotics. *Id.* at ¶ 78. Detective Mazariegos had experience in investigating sophisticated criminal enterprises, including organized crime, sex trafficking networks, and narcotics traffickers, and his "financial expertise" allowed him to investigate and seize monies from the illegal sale of narcotics. *Id.* at ¶ 79.

The July 2015 promotions were awarded to Erich Schmidt, to the position of Sergeant in the Financial Crimes Unit, and Richard Chapman, to the position of Sergeant in the Major Crimes Bureau. *Id*. at ¶¶ 82, 85.

The MCPO hired Schmidt in May 2000, and he was assigned to the Special Investigations Section, Financial Crimes and Public Corruption Bureau, Financial Crimes/Special Prosecution Unit. *Id*. at ¶ 83. As a "very senior" detective, he had experience in the investigation of financial crimes; he was on special assignment to the IRS for over five years, where he participated in the Financial Fraud Task Force Pilot Program and in matters where "millions of dollars had been seized." *Id*. Schmidt's supervisors at the IRS described him as an "excellent detective," and they opined that he "well represented" the MCPO during his special assignment. *Id*. At the time of his promotion, Schmidt had, without dispute, more experience than Plaintiff in the area of financial crimes. *Id*. at ¶ 84.

Chapman is an African American male who joined the MCPO in March 2003, and he is Plaintiff's senior by three and a half years. *Id*. at ¶ 85. He was assigned to the Criminal Investigation Section, Major Crimes Bureau, Homicide/Property Crimes Unit, and he served as the lead detective in a significant amount of high-profile murder and sexual assault cases. *Id*. As a former detective in the Asbury Park Police Department, Chapman was trained in the following areas: internal affairs investigations; bias crime investigations; child abuse investigations; sexual assault investigations; and homicide investigations. *Id*. He was "well respected" by his peers and supervisors at the MCPO, who viewed him as a "dedicated solid major crimes Detective." *Id*.

Finally, the December 2015 promotions were awarded to Richard Brocculiere, to the position of Sergeant in the Special Investigations Section, Prosecution Support Bureau, Computer Crimes Unit, and Scott Samis, to the position of Sergeant in the Special Investigations Section,

Trial and Administrative Support Bureau, Trial Support/Fugitives/Juvenile Crime Unit. *Id*. at ¶¶ 87, 89.

Before the MCPO hired Broccoliere, he was employed by the United States Secret Service, where he developed a background in computer crimes. *Id*. at ¶ 88. Bruccoliere was ultimately promoted to the position of Sergeant in the Computer Crimes Section, because of his "specialized skills" and expertise which were required to qualify for that "highly technical" position. *Id*.

The MCPO hired Samis in 2003, more than three years before Plaintiff. *Id*. at ¶ 90. Samis primarily served in the Narcotics Unit during the course of his tenure at the MCPO, during which worked on loan to the DEA for a three-year period. *Id*. at ¶ 91. Detective Samis was viewed favorably by his peers, and he was considered to be a "very senior, dedicated and high-energy detective" who developed a reputation for mentoring younger and less experiences colleagues. *Id*. at ¶ 92. He played a significant role in the resolution of the Melton Case, and his supervisors recommended him for the promotion. *Id*. at ¶ 93.

On March 24, 2016, Plaintiff filed the instant Complaint against Defendants. On January 11, 2017, the Court issued an Opinion wherein all of Plaintiff's claims were dismissed, except for the following claims: (i) violations of 42 U.S.C. § 1983 against the MCPO and Prosecutor Gramiccioni, in his individual capacity; (ii) Title VII against the MCPO; and (iii) NJLAD against all Defendants.

In the instant matters, Defendants separately move for summary judgment on those remaining claims, arguing that their promotional decisions were based on legitimate non-discriminatory reasons, and that Plaintiff has failed to prove a discriminatory practice or custom under *Monell*. Plaintiff oppose the motions.

## II.    STANDARD OF REVIEW

Summary Judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *Id*. at 331. On the other hand, if the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id*. Once the movant adequately supports its motion pursuant to Rule

56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley*, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

## III.   ANALYSIS

### A.   L. Civ. R. 56.1(a)

As a threshold issue, Defendants argue that each of their Statements of Material Facts should be deemed admitted, because Plaintiff has failed to comply with Local Civil Rule 56.1(a), which provides:

> The opponent of summary judgment shall furnish, with its opposition papers, a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion; any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion.

L. Civ. R. 56.1(a). Notwithstanding this obligation, Plaintiff has not filed a response, *i.e.*, statement under the Local Rule, in which he addresses each paragraph of Defendants' factual assertions, in order to identify the specific facts in dispute. To the contrary, Plaintiff appears to have improperly submitted his own separate statement of undisputed material facts, generally asserting, in a blanket fashion, "that there are numerous issues of material fact which must result in the denial of the Defendant[s'] Motions." Plaintiff's 56.1 Statement ("Baldwin Statement"), ¶ 2; *Mehr v. Atl. City*, No. 12-4499, 2014 U.S. Dist. LEXIS 121869, at *9 n.3 (D.N.J. Sept. 2, 2014) ("[T]he Local Rules do not contemplate a nonmoving party furnishing its own statement of undisputed material facts."); *see also Ballard v. AT&T Mobility, Inc.*, No. 15-8808, 2017 U.S. Dist. LEXIS 136774, at *2 n.2 (D.N.J. Aug. 25, 2017). Although the Court may deem Defendants' factual assertions admitted based on Plaintiff's failure to comply with L. Civ. R. 56.1(a), an entry of summary judgment in favor of Defendants is still proper, even if Plaintiff's submission is considered. *Hill v. Algor*, 85 F. Supp. 2d 391, 408 (D.N.J. 2000) ("Facts submitted in the statement of material facts which remain uncontested by the opposing party are deemed admitted.").

### B.     Title VII and NJLAD

*i.     Prima Facie Case*

During the relevant time period, Plaintiff contends that he applied for a promotion on four separate occasions. However, on each of those occasions, Plaintiff argues that Defendants selected lessor qualified or lessor experienced non-African American candidates instead of him, all of whom were treated more favorably during the promotional process, in violation of Title VII and NJLAD.[3] As such, Plaintiff's Title VII and NJLAD claims consist of four separate incidents of

---

[3]     The Court notes that Title VII and NJLAD apply the same standard for employment discrimination. *See Murphey v. Hous. Auth. and Urban Redev. Agency*, 32 F. Supp. 2d 753, 763 (D.N.J. 1999).

alleged discrimination. With respect to the promotion of Richard Chapman, one of the selected candidates, Defendants argue that Plaintiff cannot raise an inference of discrimination as he, too, is an African American male.

Discrimination claims brought under Title VII and the NJLAD are analyzed according to the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later clarified in *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981) and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993). *Davis v. City of Newark*, 285 Fed. Appx. 899, 903 (3d Cir. 2010); *see Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 498 (3d Cir. 1999) ("Analysis of a claim made pursuant to the NJLAD generally follows analysis of a Title VII claim"); *Bergen Commercial Bank v. Sisler*, 157 N.J. 188, 194 (1999) (citations omitted) (finding that a claim of employment discrimination under Title VII or NJLAD be analyzed under the same standard).

To establish a *prima facie* case of discrimination in a failure to promote case, the plaintiff must show (1) that he was a member of a protected class; (2) that he applied and was qualified for a job for which the employer was seeking applicants; (3) that, despite his qualifications, he was rejected; and (4) that another, not in the protected class, was treated more favorably. *Fuentes v. Borough of Watchung*, 286 Fed. Appx. 781, 784 (3d Cir. 2008); *Davis*, 285 Fed. Appx. at 903; *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410-12 (3d Cir. 1999); *Burdine*, 450 U.S. at 253-54 & n.6; *McDonnell Douglas*, 411 U.S. at 802.

A plaintiff may satisfy the fourth factor in a number of ways, including, but not limited to, comparator evidence, evidence of similar racial discrimination of other employees, or direct evidence of discrimination from statements or actions by supervisors suggesting racial animus. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511-12 (2002); *Golod v. Bank of Am. Corp.*, 403 Fed.

Appx. 699, 703 n.2 (3d Cir. 2010). More specifically, when presenting comparator evidence, on summary judgment, a plaintiff must submit evidence that she is "similarly situated" to her comparators and that these employees have been treated differently or favorably by their employer. *See Williams v. Morton*, 343 F.3d 212, 221 (3d Cir. 2003); *Andy v. UPS*, No. 02-8231, 2003 U.S. Dist. LEXIS 25193, at *33 (E.D. Pa. Oct. 28, 2003); *Simpson v. Kay Jewelers*, 142 F.3d 639, 645 (3d Cir. 1998). Significantly, "[s]imilarly situated" means "similar 'in all relevant respects.'" *Id.* (*quoting Singh v. Wal-Mart Stores, Inc.*, No. 98-1613, 1999 U.S. Dist. LEXIS 8531, at *19 (E.D. Pa. June 10, 1999)); *see Kline v. Kansas City, Mo., Fire Dept.*, 175 F.3d 660, 670-71 (8th Cir. 1999); *see also Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (plaintiff must show he was "similar in all of the relevant aspects" to persons allegedly receiving preferential treatment); *Holifield v. Reno*, 115 F.3d 1555, 1563 (11th Cir. 1997) ("in all aspects"); *Shumway v. United Parcel Service*, 118 F.3d 60, 64 (2d Cir. 1997) ("similarly situated in all material respects"); *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989) ("in all relevant aspects"). This includes similarities between the requirements, duties and responsibilities of the respective jobs, but also similarity of the conduct (or misconduct) in which each employee engaged. *Dill v. Runyon*, No. 96-3584, 1997 U.S. Dist. LEXIS 4355, at *12 (E.D. Pa. 1997) ("To be deemed 'similarly situated,' the individuals with whom a plaintiff seeks to be compared must 'have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.") (quoting *Anderson v. Haverford College*, 868 F. Supp. 741, 745 (E.D. Pa. 1994)).

Here, as to the promotion given to Mr. Chapman, Defendants argue that Plaintiff cannot establish a *prima facia* case of discrimination, because Mr. Chapman is an African American male who was elevated to the position of Sergeant in the Major Crimes Bureau in August 2015. I agree,

as Plaintiff does not dispute that Chapman is a member of the same protected class.[4] Accordingly, Plaintiff cannot satisfy the fourth factor of his *prima facie* burden as to the decision to promote Chapman, *i.e.*, that another individual, not in the protected class, was treated more favorably. *Hargrave v. Ramsey*, No. 15-201, 2016 U.S. Dist. LEXIS 75111, at *14 (E.D. Pa. June 9, 2016) (holding that a "fellow employee who is a member of the same protected class as [the plaintiff] and who received the treatment [that the plaintiff] claims he was denied cannot serve as a comparator for [the plaintiff] in a discrimination claim.") (citation omitted); *Houston v. Dialysis Clinic, Inc.*, No. 13-4461, 2015 U.S. Dist. LEXIS 83151, at *6 (D. N.J. June 26, 2015). Accordingly, Plaintiff's failure to promote claim in this context is dismissed.

### ii.    *McDonnell Douglas Burden Shifting*

Defendants do not dispute that Plaintiff can establish a *prima facie* case with respect to the remaining promotions at issue. Rather, as to the other individuals who were promoted, Defendants contend that their decisions were solely based on legitimate non-discriminatory reasons. MCPO's Brief in Support of Summary Judgment ("MCPO Brief"), at 34-39; Defendant Prosecutor Gramiccioni's Brief in Support of Summary Judgment ("Gramiccioni Brief"), at 22-23. Therefore, the Court proceeds to apply the burden shifting analysis under *McDonnell Douglas*.

---

[4]    In a conclusory fashion, Plaintiff argues that Chapman was merely promoted as a "smokescreen." However, in the absence of any evidentiary support, Plaintiff's unsubstantiated assertions are insufficient to create a *prima facie* case of discrimination. *See, e.g., King v. Cape May County Bd. of Freeholders*, No. 04-4243, 2007 U.S. Dist. LEXIS 57515, at *3(D.N.J. Aug. 8, 2007)("[I]n a summary judgment motion the Court does not have to credit bald statements unsubstantiated by at least circumstantial evidence . . . . Accordingly, the Court finds Plaintiff has not made a *prima facie* showing of . . . discrimination because she has not provided any evidence to substantiate such a claim.") (citation omitted); *Churchill v. Int'l Bus. Mach., Inc., Nat'l Serv. Div.*, 759 F. Supp 1089, 1097 (D.N.J. 1991) (finding that a "subjective impression," without any documentary evidence, is not sufficient to establish *prima facie* showing of discrimination under the law).

If a plaintiff succeeds in establishing a *prima facie* case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employee's termination. *Gerard v. Bridge Capital (USVI), LLC*, 282 Fed. Appx. 969, 972 (3d Cir. 2008). "The employer satisfies its burden of production by introducing evidence which . . . would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). As the Third Circuit has noted, this burden is "relatively light" and "[t]he employer need not prove that the tendered reason actually motivated its behavior . . . ." *Id.*

Relevant in a failure to promote case, "[a]n employer must be granted substantial discretion to exercise subjective judgment in the rendering of employment decisions . . . ." *Johnson v. Penske Truck Leasing Co.*, 949 F. Supp. 1153, 1172 (D.N.J. 1996) (citing *Burdine*, 450 U.S. at 259). "Unless there is evidence of discrimination, the court is neither permitted to get involved in the subjective [] decision of the employer, nor set its own employment standards for the employer." *Jones v. Temple University*, No. 12-5349, 2014 U.S. Dist. LEXIS 94253, at *28 (E.D. Pa. Jul. 10, 2014) (citing *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 527 (3d Cir. 1992)). Stated differently, a plaintiff's subjective comparison of qualifications would not typically cast sufficient doubt on the employer's stated legitimate reasons for its selection. *Luta v. Dep't of Health & Social Servs.*, 847 F. Supp. 2d 683, 691 (D. Del. 2012) (citing *Bennun v. Rutgers State University*, 941 F.2d 154, 170 (3rd Cir. 1991) ("This Court has held that more than a denial of promotion as a result of a dispute over qualifications' must be shown to prove pretext.")).

These principles are particularly applicable within the context of this case. The New Jersey Legislature "as well as the courts have long recognized the strong policy considerations which dictate that since the county prosecutor is charged with heavy enforcement responsibilities he must

be given broad powers to appoint his own personnel; thus he appoints his own assistant prosecutors and investigators within the maxima prescribed by statute." *Cetrulo v. Byrne*, 31 N.J. 320, 328 (1960) (citations omitted); *Coleman v. Kaye*, 87 F.3d 1491, 1502 (3d Cir. 2006). Indeed, "it is clear that the Legislature intended to vest in the prosecutor a great deal of latitude and discretion in the selection of his investigative staff, with the tenured position of county detective balanced by investigators serving at his pleasure in whom, as was aptly put in the statement attached to the original bill creating the position . . ., he has that degree of confidence resulting from personal, intimate knowledge. *Zamboni v. Stamler*, 194 N.J. Super. 598, 605 (App. Div. 1984) (citation and quotation omitted).

If the employer is able to articulate a legitimate, nondiscriminatory reason, "the plaintiff must then show that the proffered reason was a pretext for a racially discriminatory decision." *Id*. To show pretext, the plaintiff's evidence must either "(1) cast[] sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or (2) allow[] the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes*, 32 F.3d at 762; *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 198 (3d Cir. 2015). The plaintiff "cannot simply show that the employer's decision was wrong or mistaken" but rather "must demonstrate such 'weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reason for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] nondiscriminatory reasons.'" *Ross v. Gilhuly*, 755 F.3d 185, 194 n.13 (3d Cir. 2014) (alteration in original) (quoting *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 331 (3d Cir. 1995)). "While this standard places a difficult burden on the plaintiff, [i]t arises from an inherent

tension between the goal of all discrimination law and our society's commitment to free decision making" by employers. *Fuentes*, 32 F.3d at 765 (citation and quotation omitted).

Here, Plaintiff applied for a promotion four separate times, *i.e.*, May 13, 2014, December 1, 2014, July 28, 2015, and December 9, 2015. On each occasion, a total of approximately thirty applications were submitted for consideration, from which Defendants chose two candidates, including: George Snowden and Michael Clancy in May 2014; Ryan Muller and Walter Mazariegos in December 2014; Eric Schmidt and Richard Chapman in July 2015; and Richard Brocculiere and Scott Samis in December 2015. Defendants have proffered legitimate, nondiscriminatory reasons with respect to their decisions to promote each of these individuals instead of Plaintiff.

As to Snowden, Defendants contend that he was promoted to the position of Sergeant in the Narcotics Unit, a rank which he previously held at the Newark Police Department. MCPO Facts, ¶ 68. According to Defendants, Snowden had substantial experience in conducting narcotics and wire intercept investigations, advancing "from a supporting role to lead investigator." *Id*. Indeed, having "spent his entire career" in a field which related to the position he was ultimately promoted to, Defendants maintain that Snowden developed a reputation as a "go-to person" at the MCPO, for narcotics investigations where "wiretapping expertise was vital." *Id*.

As to Clancy, Defendants maintain that he was promoted to the position of Sergeant in the Major Crimes Unit, because he had received a broad range of training in various areas of criminal investigation, such as: homicide investigations, hostage/crises negotiations, and arson investigations. *Id*. at ¶ 70 Defendants also submit that, in his prior role as the Chief Negotiator, Clancy supervised a six-member team that handled suspect negotiations on all suicidal, barricaded, and hostage situations throughout Monmouth County. *Id*. As a "hard-working Detective" who was

spoken "very highly of," Defendants maintain that Clancy had a reputation for utilizing "innovative and different" techniques for solving major crimes, after successfully conducting several "complex" homicide/robbery and arson investigations at the MCPO. *Id.*

As to Muller, Defendants submit that he was promoted to the position of Sergeant in the Forensics Unit, a "specialized unit" which required a significant amount of training, in which Plaintiff never worked. *Id.* at ¶¶ 73-74. Defendants maintain that Muller had substantial experience in conducting forensics investigations, he was qualified as a Fingerprint Expert, Firearms Expert, and Crime Scene Investigation Expert, and he ultimately distinguished himself as the "go to person" within the Forensic and Technical Bureau, the section within which he was ultimately promoted. *Id.* at ¶ 75.

As to Mazariegos, a bilingual Hispanic American who is a member of a protected class, Defendants contend that he was promoted to the position of Sergeant in the Narcotics Unit, because of his "significant expertise in all areas of narcotics investigations." *Id.* at ¶¶ 77, 80. In fact, having previously performed sensitive prescription narcotics investigations and sophisticated criminal enterprises, including organized crime, sex trafficking networks, and narcotics traffickers, Defendants maintain that Mazariego's developed a "substantial financial expertise," which qualified him to investigate and seize monies from the illegal sale of narcotics. *Id.* at ¶ 79.

As to Schmidt, Defendants proffer that he was promoted to the position of Sergeant in the Financial Crimes Unit, because he was a "very senior detective" with substantial experience in the investigation of financial crimes, having worked on special assignment for the IRS in the Financial Fraud Task Force Pilot Program. *Id.* at ¶ 83. As such, at the time of his promotion, Defendants viewed Schmidt as having significantly more experience than Plaintiff in the area of financial crime. *Id.* at ¶ 84.

As to Brocculiere, Defendants submit that he was promoted to the position of Sergeant in the Computer Crimes Unit, because of his background, "specialized skills," and expertise in computer crimes, all of which were required in order to serve in such a "highly technical" position at the MCPO. *Id*. at ¶¶ 87- 88.

As to Samis, Defendants provide that he was promoted to the position of Sergeant in the Narcotics Unit, to which he was assigned for the majority of his career at the MCPO. *Id*. at ¶ 91. According to Defendants, Samis was a "very senior, dedicated and high-energy detective" who played a significant role in the resolution of the Melton Case; he also developed a reputation for mentoring his younger and less experienced colleagues. *Id*. at ¶ 92. In that same vein, Defendants aver that Samis was well liked, and his supervisors recommended him for a promotion. *Id*. at ¶ 93.

I find that Defendants have provided legitimate, nondiscriminatory reasons for all of the promotional decisions during the relevant time period. Accoridngly, having made that finding, the burden shifts back to Plaintiff in order to demonstrate that Defendants' stated reasons were pretextual.

To discredit Defendants' proffered reasons, Plaintiff first argues that he possessed more "investigative experience," "professional training/education," "supervisory experience," and "accolades" than all of his promoted colleagues, and Defendants have disregarded his significant contributions to the Melton Case, as well as his positive impact on other high-profile investigations at the MCPO. Plaintiff's Brief in Opposition to Summary Judgment ("Pl.'s Brief"), at 8. Second, Plaintiff maintains that Defendants mischaracterized his management experience, as they fail to acknowledge the fact that he previously worked in a supervisory capacity at the Essex County Prosecutor's Office and the Somerset County Prosecutor's Office. *Id.*, at 9-11. Conversely, Plaintiff contends that the "Caucasian Detectives" who were promoted either received credit for

their prior supervisory roles, or they were not penalized for their lack of management experience. *Id.* Third, according to Plaintiff, the MCPO utilized experienced African Americans in order to train inexperienced Caucasian personnel, who were subsequently promoted to higher ranks. *Id.*, at 12-13. I will address each of Plaintiff's arguments in turn.

First, the manner in which Defendants conducted the promotional process undermines Plaintiff's pretext arguments. After interested detectives submitted promotional memoranda for a vacant supervisory position, Chief Pasterchick initially reviewed the applications with his Staff in order to obtain their "thoughts and recommendations," on the basis of the particular staffing needs of the vacant supervisory position, and the candidate's leadership skills, evaluations, and seniority. Significantly, sixty percent of Chief Pasterchick's Staff, with whom he reviewed the promotional memoranda, consisted of minority members during most of his tenure at the MCPO. MCPO Facts, ¶¶ 44-45, 50. The Chief of Detectives would subsequently provide the recommended candidates to the Prosecutor and his Executive Staff, who then met to deliberate over the recommendations.

Although the selection of the final candidate falls within the Prosecutor's discretion, Prosecutor Gramiccioni accorded significant weight to the recommendations of Chief Pasterchick and his Staff. Indeed, during his deposition, Prosecutor Gramiccioni provided the following testimony:

> Q. And how were you - - how did you determine the needs of the department?
>
> A. How? Often times, it was driven by whatever vacancy existed in the organizational chart, depending on the unit or bureau or otherwise, but the needs were assessed in large part by my sworn staff. *So I relied heavily on the recommendations of the chief, of my sworn staff, the chief of detectives and, you know, he was consulted and discussed the matter with his deputy chief, his captains, so on and so forth.*

Tr. dated August 30, 2018, T77:8-18 (emphasis added). Notably, Plaintiff does not dispute that the applications were initially reviewed by, and Chief Pasterchick's recommendations were based on, the thoughts and opinions of the Chief's Staff which was predominantly comprised of minority members. Nor does Plaintiff dispute that Prosecutor Gramiccioni relied heavily upon the recommendations of Chief Pasterchick, or that Plaintiff was never "a top candidate who was recommended for a promotion" to Prosecutor Gramiccioni. While not dispositive, I find that these undisputed circumstances belie Plaintiff's contention of pretext as to Prosecutor Gramiccioni, because he based his promotional decisions on Chief Pasterchick's recommendations, and Plaintiff was never included in those recommendations.[5]

Next, Plaintiff argues that Defendants have inappropriately minimized his contributions to the Melton Case, and other high profile investigations at the MCPO. Pl.'s Brief, at 8. In support, Plaintiff quotes various comments from a performance evaluation while he was assigned to the Trial Support Section, wherein his immediate supervisory, Lieutenant Paul Butkoff, rated Plaintiff as an "exceeds expectations":

> on numerous occasions Monmouth County assistant prosecutors have commended Detective Baldwin on his perseverance with locating witnesses that no one else could locate . . . has a great knack for handling uncooperative witnesses which speaks volumes about his interpersonal skills . . . is also called to assist in various investigations that he was assigned in pervious units" . . . on many occasions Detective Baldwin has assisted his fellow detectives with various work requests. Detective [Baldwin's] extensive knowledge and experience are a true asset to his fellow detectives and this office.

---

[5] Without raising any specific factual disputes or citing contradicting evidence, Plaintiff maintains that Defendants have not submitted any evidence to show that the promotional process occurred in the manner in which they describe. Notwithstanding the fact that Plaintiff's contentions are inaccurate, as the promotional process is set forth in the MCPO's policies and procedures and, in addition, described in a sworn certification, Plaintiff's general, unsubstantiated objections are insufficient to raise a genuine issue of material fact.

Baldwin Statement, ¶ 15. Here, Plaintiff's reliance on this performance evaluation, and the favorable comments from which he cherry-picked, are not sufficient to discredit Defendants' proffered reasons for their decision not to promote Plaintiff. Indeed, as the Third Circuit has held, "[p]retext is not established by virtue of the fact that an employee has received some favorable comments in some categories or has, in the past, received some good evaluations." *Ezold*, 983 F.2d at 528 (citations omitted); *see also Turner v. Schering-Plough Corp.*, 901 F.2d 335, 343-44 (3d Cir. 1990) (the plaintiff's reliance on "highly favorable" reviews was not probative of pretext); *Sullivan v. Nationwide Life Ins. Co. of Am.*, 720 F. Supp. 2d 483, 501 n.125 (D. Del. 2010) ("[T]he mere existence of past positive performance reviews is insufficient to establish pretext") (citations omitted); *Smith v. Twp. of E. Greenwich*, 519 F. Supp. 2d 493, 508 (D.N.J. 2007); *D'Amico v. Pulte Homes, Inc.*, No. 08-1099, 2009 U.S. Dist. LEXIS 26441, at *11 (E.D. Pa. March 23, 2009) (the plaintiff's reliance on "past performance reviews" was "insufficient to cast doubt on the [defendant's] proffered" legitimate reason) With nothing more, Plaintiff cannot rely on his own performance evaluations, in isolation, in order to undermine the justifications which Defendants have provided.

Moreover, in comparison to the individuals who were ultimately promoted, Plaintiff also maintains that he possessed more of the following: "investigative experience, professional training/education, supervisory experience, and accolades." Baldwin Statement, ¶¶ 31-35. Plaintiff's contentions are wholly unsubstantiated. Indeed, he fails to submit any evidentiary support for the alleged qualifications of the promoted candidates. Clearly, while the Court would require such information for comparative purposes, Plaintiff's arguments suffer from a more fundamental issue—in order to prove pretext, "more than a denial of promotion as a result of a dispute over qualifications' must be shown." *Bennun*, 941 F.2d at 170 (quoting *Molthan v. Temple*

*Univ.*, 778 F.2d 955, 962 (3d Cir. 1985)); *Dungee v. Northeast Foods*, 940 F. Supp. 682, 689 (D.N.J. 1996) ("[Plaintiff's assertions that she was more qualified amount to nothing more than an attempt to displace the defendants' business judgment with her own, and is thus is insufficient to overcome summary judgment."). Accordingly, even if Plaintiff's allegations with respect to his credentials are accurate, that would not discredit Defendants' proffered reasons for failing to promote Plaintiff.

Second, Plaintiff argues that Defendants failed to acknowledge his supervisory and leadership experience. Before joining the MCPO, Plaintiff was employed as a "field supervisor," and, in that connection, Plaintiff maintains that such a position is equivalent to the rank of sergeant,[6] as he was responsible for supervising municipal detectives. Pl.'s Brief, at 9. According to Plaintiff, Clancy and Snowden, "non-African Americans" who Defendants promoted, were "credited" with management experience, whereas the other selected candidates, including Samis, Muller, Mazariegos, Schmidt, and Brocculiere, were not penalized for lacking relevant supervisory experience. Pl.'s Brief, at 9-11. However, the Court finds Plaintiff's arguments without any merit.

Here, Plaintiff neither specifically refutes Defendants' proffered legitimate reasons for each promotional decision, nor does he consider the evaluative criteria which guided their selections.[7] Rather, Plaintiff's arguments are raised in a sweeping fashion, as he generally

---

[6]  Plaintiff has not submitted any evidence to show that a "field supervisor" corresponds to the position of sergeant in the MCPO. Rather, Plaintiff states his own subjective belief as to the equivalence of those positions.

[7]  As stated, Prosecutor Gramiccioni specifically identified an evaluative list of criteria in an email to his Executive Staff, which included a candidate's ability to perform the following tasks: (a) manage and lead with quick and informed decision making; (b) abide by the chain of command; (c) enforce office rules and regulations on behalf of management; (d) teach/train detectives within their unit; and (e) positively contribute to moral and [spirit of the detective corps. and] the unit and the office. Gramiccioni Facts, ¶ 19, Ex. C. Prosecutor Gramiccioni also clarified that, although "time in service" or seniority was an important factor, the MCPO should not hesitate to promote a more junior candidate who satisfied the aforementioned criteria. *Id.* at ¶ 9, Ex. H.

contends that the selected candidates were chosen instead of him, because Defendants treated them in a more favorable fashion during the promotional process. As an example, Plaintiff contends that Defendants disregarded his prior supervisory responsibilities, whereas Clancy and Snowden's management skills were explicitly acknowledged as a basis for their promotions. However, Plaintiff's position is unsubstantiated, as he does not provide any documentary evidence to show that Defendants did not consider his promotional memorandum, wherein he described his prior supervisory roles. In fact, Plaintiff does not dispute that "every submission," including his, was reviewed and considered. MCPO Facts, ¶ 48. Rather, Plaintiff solely relies upon the following portion of Defendants' brief:

> In all of the promotional meetings of the Prosecutor's Executive Staff, neither Chief Pasterchick, nor any other member of the Executive Staff, ever recommended Detective Baldwin to the Prosecutor for a promotion. The prosecutor and his Executive Staff, including Chief Pasterchick[,] were always in agreement that other candidates were more suitable for the promotion based on that candidate's specialized skills and experience, work ethic, as well as possession of his/her leadership qualities.

MCPO Brief, at 24-25. Plaintiff misinterprets Defendants' assertions, which cannot be construed to reasonably mean that Plaintiff "was never in a position of management or leadership" during the course of his career in law enforcement. Pl.'s Brief, at 9. Instead, the above-quoted language simply explains that each candidate who was selected over Plaintiff, in Defendants' judgment, possessed a background that was more appropriately tailored to the position at hand. Without relying on an iota of evidence, Plaintiff cannot presume that Defendants failed to consider his previous "supervisory and leadership experience," merely because he was never promoted. *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 383 n.12 (3d Cir. 1990) ("[A]n inference based

upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment").[8]

Plaintiff's contentions with respect to the other promoted candidates, including Samis, Muller, Mazariegos, Schmidt, and Brocculiere, are also unsupported by any evidence. Indeed, while Plaintiff argues that they were not penalized for their lack of leadership or management experience, he has failed to produce their resumes, promotional memorandums, or any other document which relates to their credentials. Without this evidence, Plaintiff's contention as to their alleged qualifications are based on his own subjective belief, upon which he cannot rely to carry his burden on pretext. *Jones v. Sch. Dist.,* 198 F.3d 403, 414 (3d Cir. 1999) (affirming summary judgment for insufficient evidence of pretext where plaintiff's allegations were based solely on his beliefs and no record evidence); *Pineda v. Phila. Media Holdings LLC*, 542 F. Supp. 2d 419 (E.D. Pa. 2008) (finding that summary judgment cannot be defeated simply based on plaintiff's own subject belief of discrimination).

Plaintiff raises an additional argument, solely with respect to the promotions of Muller, Mazariegos, Schmidt, and Brocculiere, all of whom were undisputedly promoted to "highly technical" positions that demanded a "specialized" set of skills and expertise.[9] Plaintiff contends that, "[a] case could be made for keeping these Detectives in their respective units for their expertise, but not supervising the units due to their lack of management experience as such a move would be in the MCPO's best interest." Pl.'s Brief, at 11. Notwithstanding his evidentiary

---

[8]     While Plaintiff contends that Defendants "praised the leadership skill-set" of Detective Mahoney within the context of a non-law-enforcement job, this argument fails to show that Defendants' proffered reasons are pretextual. Mahoney was not one of the promoted candidates during the relevant time period. Pl.'s Brief, at 10.

[9]     Without reaching the issue, the Court questions whether Plaintiff could have qualified for the promotions that these candidates received, as Plaintiff does not attempt to argue, nor does the record show, that he had the requisite qualifications.

deficiencies, Plaintiff's argument fails, because it merely challenges the "subjective business decision of [his] employer." *Jones*, 2014 U.S. Dist. LEXIS 94253, at *28. Even if Defendants, in an exercise of their own discretion, misjudged the most qualified or suitable candidates for promotion, Plaintiff would still be unable to show that he suffered discrimination. *Ross*, 755 F.3d at 194 n.13 ("[A] plaintiff cannot simply show that the employer's decision was wrong or mistaken[.]"); *Fuentes*, 32 F.3d at 765 ("[T]he factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.").

Finally, Plaintiff contends that his assignment to the Trial Unit is probative of pretext, because Defendants described him as an "unremarkable" detective, but yet transferred him to a section of the department which served as an important training ground for newly hired detectives. Pl.'s Brief, at 12. In that connection, Plaintiff contends that "[u]sing experienced African Americans to train inexperienced Caucasian personnel," who were then promoted to more prestigious ranks, "was not uncommon at the MCPO." *Id*. However, Plaintiff's arguments lack merit.

Here, as an example of the manner in which Defendants discriminated against African American staff members, Plaintiff argues that Barry DuBrosky, a Caucasian Captain, holds a higher rank than Wesley Mayo, a more senior African American Lieutenant who trained Mr. DuBrosky. *Id*. at 12-13. However, this single example cannot establish that Defendants inappropriately engaged in the discriminatory practices that Plaintiff describes, particularly since he, once again, neither addresses the evaluative criteria which guides the MCPO's promotional decisions, nor provides any evidence in support of the qualifications and credentials of Mr. Mayo and Mr. DuBrosky in order for this Court to properly compare the two. As such, the Court cannot

reasonably infer, without resorting to speculation, that Mr. DuBrosky was ultimately promoted to a higher position than Mr. Mayo,[10] on the basis of a general discriminatory bias toward African Americans. In addition, Plaintiff's contentions with respect to the positions held by African Americans at the MCPO conflicts with the record, as Plaintiff does not dispute that, at the time of his internal complaint, two of the three Captains (66.6%), two of the eight lieutenants (25%), and one of the ten sergeants (10%) were African Americans.

In conclusion, Plaintiff fails to substantiate his claims with objective evidence, *i.e.*, promotional memoranda, resumes, or related documents. Time and time again, Plaintiff's arguments are without factual basis, as he either relies on nothing more than his own subjective beliefs and opinions, or he inappropriately challenges Defendants' authority to exercise discretion in employment decisions. However, because none of these grounds are sufficient to show that Defendants' promotional decisions, during the disputed time period, were motivated by discriminatory animus toward Plaintiff, no reasonable jury could find that Defendants' proffered legitimate, nondiscriminatory reasons for not promoting Plaintiff were pretextual. Therefore, summary judgment in favor of Defendants on Plaintiff's Title VII and NJLAD claims is appropriate.

### C.    **Section 1983** *Monell* **Claim**

Defendants also move for summary judgment on Plaintiff's § 1983 claim under the Fourteenth Amendment of the Equal Protection Clause, on the basis of his failure to either prove a formal policy and procedure or an unofficial custom and practice of discrimination in connection

---

[10]     The Court notes that Plaintiff does not contend that Mr. Mayo, who serves in a supervisory role as a Lieutenant, submitted an application to be promoted to the position of Captain. Nonetheless, even if Mr. Mayo applied for such a promotion, Plaintiff has not shown that Mr. Mayo was not selected because Defendants harbored a discriminatory animus towards African Americans.

with the promotional process. MCPO Brief, 26-33. In opposition, Plaintiff does not contend that the alleged discriminatory acts were implemented as a result of a formal policy and procedure to discriminate; rather, he contends that Defendants engaged in an unofficial custom and practice of discrimination, because they did not implement an objective test during the promotional process, nor did they document the promotional process. Pl.'s Opposition, at 13-17. Plaintiff's position is without merit.

To bring a claim under Section 1983, a plaintiff must show that, among other things, the defendant "deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Kost v. Kozakiewicz*, 1 F.3d 176, 184 (3d Cir. 1993) (quoting *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each [defendant], through [her] own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676 (citing *Monell v. Dep't of Soc. Services*, 436 U.S. 658, 691 (1978); *Robertson v. Sichel*, 127 U.S. 507, 515-16 (1888); *Dunlop v. Munroe*, 11 U.S. 242, 3 L. Ed. 329 (1812)). In other words, under *Monell* a municipality cannot be held liable solely because it employs an alleged tortfeasor, but "is liable under § 1983 when a plaintiff can demonstrate that the municipality itself, through the implementation of a municipal policy or custom, causes a constitutional violation." *Mann v. Palmerton Area Sch. Dist.*, 872 F.3d 165, 175 (3d Cir. 2017); *see also Thomas*, 749 F.3d at 222; *McTernan v. City of York*, 564 F.3d 636, 657 (3d Cir. 2009).

Indeed, as to the policy or custom, "[a] policy may be made only when a policymaker issues an official proclamation or decision." *Hernandez v. Borough of Palisades Park Police Dep't*, 58 Fed. Appx. 909, 912 (3d Cir. 2003). Conversely, "[a] custom may exist where the relevant practice is so permanent and 'widespread as to have the force of law.'" *Id.* (quoting *Board*

*of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)). In addition to imposing liability through a municipality's custom or policy, liability may also exist on a *Monell* claim based on a municipal defendant's failure to properly train employees to avoid violating constitutional rights. *See Connick v. Thompson*, 563 U.S. 51, 61 (2011) (holding that a municipality's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.").

Here, Plaintiff's § 1983 claim fails. Indeed, Plaintiff has not produced any evidence to show that he was discriminated against in violation of Title VII and NJLAD. *See Deninno v. Municipality of Penn Hills*, 269 Fed. Appx. 153, 158 (3d Cir. 2008) ("Even more fundamentally, there can be no municipal liability here because we have determined that none of the individual Defendants violated the Constitution."); *Grazier v. City of Phila.*, 328 F.3d 120, 124 (3d Cir. 2003) (holding that municipal liability requires constitutional harm); *Johnson v. City of Phila.*, 837 F.3d 343, 354 (3d Cir. 2016). Without an underlying constitutional violation, there could be no *Monell* liability against the municipality.

Although summary judgment may be entered against Plaintiff solely on this basis, the Court, nonetheless, finds that Plaintiff has failed to show a discriminatory custom or practice pursuant to § 1983. Contrary to Plaintiff's contentions, Defendants' reliance on various subjective criteria during the promotional process is, in of itself, not sufficient for liability to attach. *See Beckett v. Department of Corrections*, 981 F. Supp. 319, 327 (D. Del. 1997) (citing *Shealy v. City of Albany*, 89 F.3d 804, 805 (11th Cir. 1996) ("[S]ubjective promotion criteria are not discriminatory *per se*[.]"); *see also Delgado v. SEPTA*, No. 06-0848, 2007 U.S. Dist. LEXIS 91532, at *14 (E.D. Pa. 2007).

In addition, the argument that Defendants failed to document the promotional process fares no better. Plaintiff contends that such an obligation was established by Section 5 of the MCPO's promotional policies and procedures, which states: "[a]ny candidate(s) who were not promoted may ask the Prosecutor to review with them the result of his/her decision." Certification of Raymond Hamlin (dated November 14, 2018), ¶ 3, Ex. L. Although that provision does not explicitly require Defendants to document the promotional decision-making process, even if Defendants failed to comply with their own internal policies, liability under § 1983 would still not attach without an underlying constitutional violation. Accordingly, summary judgment as to Plaintiff's claims under § 1983 is appropriate.

## IV.  CONCLUSION

For the reasons set forth above, Defendants' Motions for Summary Judgment are **GRANTED** in their entirety.

Dated: May 29, 2019

/s/ Freda L. Wolfson
Freda L. Wolfson
United States Chief District Judge
